# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

| | |
|---|---|
| WILZAYLAN BRITO SOLIS,<br><br>    Plaintiff,<br><br>v.<br><br>AMERICAN EXPRESS NATIONAL BANK; CAPITAL ONE, N.A.; CITIBANK, N.A.; DISCOVER FINANCIAL SERVICES INC.; LVNV FUNDING LLC; MIDLAND CREDIT MANAGEMENT INC.; RESURGENT CAPITAL SERVICES, L.P.; SYNCHRONY BANK; TD BANK USA, N.A.; UPLIFT INC.; EQUIFAX INFORMATION SERVICES LLC; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC; CREDIT CONTROL LLC; RADIUS GLOBAL SOLUTIONS LLC; SOURCE RECEIVABLES MANAGEMENT, LLC,<br><br>    Defendants. | **Case No.: 5:23-cv-00208-JSM-PRL**<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Wilzaylan Brito Solis ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.* against Defendants American Express National Bank ("Amex"); Capital One, N.A. ("Capital One"); Citibank, N.A. ("Citibank"); Discover Financial Services, Inc. ("Discover"); LVNV Funding LLC ("LVNV"); Midland Credit Management Inc. ("Midland"); Resurgent Capital Services, L.P. ("Resurgent"); Synchrony Bank ("Synchrony"); TD Bank USA, N.A. ("TDB"); Uplift Inc. ("Uplift"); Equifax

Information Services LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union"); Credit Control LLC ("Credit Control"); Radius Global Solutions LLC ("Radius"); and Source Receivables Management, LLC ("SRM") (referenced collectively as "**Defendants**"; Amex, Capital One, Citibank, Discover, LVNV, Midland, Resurgent, Synchrony, TDB and Uplift the "**Furnishers**"; and Equifax, Experian and Trans Union the "**CRAs**"; and Credit Control, Midland, Radius and SRM the "**Debt Collectors**").

## I. INTRODUCTION.

1. Plaintiff's Complaint arises from violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681 *et seq.* by the Defendants. "Consumer reports" under §1681a(d) include both credit file disclosures obtained directly by Plaintiff from the consumer reporting agencies and consumer reports obtained by third parties as a factor in establishing Plaintiff's eligibility for credit.

2. Plaintiff contends CRAs failed to take action as required under §1681c-1, after being alerted of the theft of Plaintiff's identity.

3. Plaintiff contends CRAs failed to block accounts from being included in Plaintiff's consumer reports following notices that the accounts were the product of the theft of Plaintiff's identity in violation of §1681c-2.

4. Plaintiff contends CRAs further failed to conduct a reasonable investigation required after each and every dispute Plaintiff submitted to CRAs as

required under §1681i.

5.      Plaintiff contends CRAs failed to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's consumer reports, and consequently reported inaccurate information about Plaintiff in violation of §1681e(b).

6.      Plaintiff contends Furnishers failed to conduct a reasonable investigation required as required under §1681s-2(b), after each and every dispute Plaintiff submitted to CRAs and forwarded to each of Furnishers.

7.      Plaintiff's Complaint further arises from violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.* by Debt Collectors. The debts underlying this action qualify as "debt" as defined under §1692a(5).

8.      Plaintiff contends that Debt Collectors continued to send Plaintiff collection attempts after Debt Collectors knew that Plaintiff refused to pay debts because they were opened as a result of the theft of Plaintiff's identity, in violation of §1692c(c).

9.      Plaintiff contends that Debt Collectors used false, deceptive, or misleading representations or means in connection with the collection of debts, including (i) the false representation of the character, amount or legal status of debts, (ii) false representations or deceptive means to collect or attempt to collect debts or to obtain information concerning Plaintiff, in violation of §1692e(2), (10).

10.    Plaintiff contends that Midland and SRM communicated to CRAs credit information which they knew or should have known was false, and further failed to communicate that the debts were disputed as they resulted from the theft of Plaintiff's identity, in violation of §1692e(8).

11.    Plaintiff's Complaint further arises from violations of the Florida Consumer Collection Practices Act ("FCCPA"), §559.55, Fla. Stat. by Debt Collectors.

12.    Plaintiff contends that Debt Collectors made claims, attempts or threatened to enforce debts that Debt Collectors knew are not legitimate or which rights do not exist, in violation of §559.72(9).

## II.    JURISDICTION AND VENUE.

13.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §1331 because Plaintiff allege violations of the Fair Credit Reporting Act, a federal law. See 15 U.S.C. §1681p and §1692k(d) (permitting actions to enforce liability in an appropriate United States District Court).

14.    Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the FCCPA claims because they are so related to Plaintiff's claims under the FCRA and FDCPA that they form part of the same case or controversy under Article III of the United States Constitution.

15.    Venue in the Southern District of Florida is proper pursuant to 28

U.S.C. §1391 because Defendants regularly transact business within this District, are otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

### III.   PARTIES.

16.   Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

17.   Plaintiff is a natural person who resides in Ocala, Florida.

18.   Plaintiff is a "consumer" as defined by the FCRA (§1681a(c)), by the FDCPA (§1692a(3)), and by the FCCPA (§559.55(8)).

19.   Amex is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 115 W Towne Ridge Pkwy, Sandy, UT 84070.

20.   Capital One is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 1680 Capital One Dr, Mclean, VA 22102.

21.   Citibank is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 701 East 60th Street North, Sioux Falls, SD 57104.

22.   Discover is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 2500 Lake Cook Road, Riverwoods,

Illinois 60015.

23.     LVNV is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 355 S Main Street, Suite 300-D, Greenville, SC 29601.

24.     LVNV can be served on its registered agent in Florida Corporation Service Company, located at 1201 Hays Street, Tallahassee, FL 32301.

25.     Midland is a "furnisher" as described by the FCRA (§1681s-2(b)), and a "debt collector" as defined by the FDCPA (§1692a(6)) and by the FCCPA (§559.55(7)). Midland's principal place of business is located at 350 Camino De La Reina, Suite 300, San Diego, CA 92108.

26.     Midland can be served on its registered agent in Florida Midland Funding LLC, located at 13008 Telecom Drive Suite 350, Tampa, FL 33637.

27.     Midland has been licensed by the Florida Office of Financial Regulation as a "consumer collection agency". (License Number: CCA0900916.)

28.     Resurgent is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 55 Beattie Place, Suite 110, Greenville, SC 29601.

29.     Resurgent can be served on its registered agent in Florida Corporation Service Company, located at 1201 Hays Street, Tallahassee, FL 32301-2525.

30.     Synchrony is a "furnisher" as described by the FCRA (§1681s-2(b))

and its principal place of business is located at 170 W Election Rd, Ste 125, Draper, UT 84020.

31. TDB is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 2035 Limestone Rd, Wilmington, DE 19808.

32. Uplift is a "furnisher" as described by the FCRA (§1681s-2(b)) and its principal place of business is located at 440 N. Wolfe Road Sunnyvale, CA 94085.

33. Uplift can be served on its registered agent VCORP Services, LLC, addressed at 108 W. 13th Street Suite 100, Wilmington, DE 19801.

34. Equifax is a "consumer reporting agency," as defined in 15 U.S.C. §1681a(f). On information and belief, Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 USC §1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309-2402.

35. Experian is a "consumer reporting agency," as defined in 15 U.S.C. §1681a(f). On information and belief, Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 USC §1681a(d), to third parties. Experian's principal place of business is located at 475 Anton Boulevard, Costa Mesa, California 92626.

36. Trans Union is a "consumer reporting agency," as defined in 15 U.S.C. §1681a(f). On information and belief, Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. §1681a(d), to third parties. Trans Union's principal place of business is located at 555 West Adams Street, Chicago, Illinois 60661.

37. Credit Control is a "debt collector" as defined by the FDCPA (§1692a(6)) and by the FCCPA (§559.55(7)), and its principal place of business is located at 3300 Rider Trail S, Earth City, MO 63045.

38. Credit Control can be served on its registered agent in Florida C T Corporation System, located at 1200 South Pine Island Road, Plantation, FL 33324.

39. Credit Control has been licensed by the Florida Office of Financial Regulation as a "consumer collection agency". (License Number: CCA0900526.)

40. Radius is a "debt collector" as defined by the FDCPA (§1692a(6)) and by the FCCPA (§559.55(7)), and its principal place of business and registered office is located at 7831 Glenroy Rd., Suite 250, Edina, Minnesota 55439–5543.

41. Radius has been licensed by the Florida Office of Financial Regulation as a "consumer collection agency". (License Number: CCA0900498.)

42. SRM is a "debt collector" as defined by the FDCPA (§1692a(6)) and by the FCCPA (§559.55(7)), and its principal place of business is located at 4615

Dundas Drive, Suite 102, Greensboro, NC 27407.

43.  SRM can be served on its registered agent in Florida C T Corporation System, located at 1200 South Pine Island Road, Plantation, FL 33324.

44.  SRM has been licensed by the Florida Office of Financial Regulation as a "consumer collection agency". (License Number: CCA9903367.)

45.  During all times pertinent to this Complaint, Defendants were authorized to conduct business in the State of Florida and conducted business in the State of Florida on a routine and systematic basis.

46.  Defendants regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. §1681a(d), to third parties. Defendants regularly furnish consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and are therefore "consumer reporting agencies" as defined by 15 U.S.C. §1681a(f) of the FCRA.

47.  During all times pertinent to this Complaint, Defendants acted through authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

48.  Any violations by Defendants were not in good faith, were knowing, negligent, willful, and intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violations.

## IV.    FACTUAL ALLEGATIONS.

### *Summary of FCRA*

49.    The FCRA governs the conduct of consumer reporting agencies to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

50.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to insure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. See, 15 U.S.C. §1681(a)(4).

51.    Specifically, the FCRA was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. See, §1681(b).

52.    Congress also recognized that CRAs "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." §1681(a)(3). Therefore, Congress determined that there "is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness,

impartiality, and a respect for the consumer's right to privacy." §1681(a)(4).

53.    For that reason, Congress ensured that the FCRA also provides special protections for victims of identity theft.

54.    The first form of protection is the "block." When a consumer identifies any information in their credit file that is the product of identity theft, the CRA must block (delete) the reporting of that information within four business days, provided the consumer submits:

a.    Appropriate proof of the identity of the consumer;
b.    A copy of an identity theft report;
c.    The identification of such information by the consumer; and,
d.    A statement by the consumer that the information is not information relating to any transaction by the consumer.

§1681c-2(a).

55.    The second form of protection the FCRA provides for identity theft victims is the "fraud alert."

56.    Specifically, upon request of the consumer, a CRA must place an "initial fraud alert" in the file of that consumer, and provide that alert along with any credit score generated in using that file, for one year beginning on the date of the request. Unless one year has passed, the CRA can only remove the alert if the consumer requests removal and the CRA receives "appropriate proof of the identity of the requester." §1681c-1(a)(1).

57.    The third form of protection the FCRA provides for identity theft

victims is a "security freeze," which a consumer can request from nationwide CRAs.

58. A security freeze prohibits a CRA from disclosing the contents of a consumer report that is subject to the freeze to any person requesting the consumer report. §1681c-1(i)(1). Stated otherwise, if a consumer's report is frozen, a CRA will not be able to sell it to creditors assessing credit applications from identity thieves using an affected consumer's identity.

59. Once placed, a security freeze does not expire. A CRA can remove a security freeze only at "the direct request of the consumer," or if it finds that the freeze "was placed due to a material misrepresentation of fact by the consumer." §1681c-1(i)(3)(A).

60. Furthermore, when a consumer requests removal, the CRA must first obtain "proper identification" from the consumer before removing the freeze." §1681c-1(i)(3)(C).

61. The fourth and final form of protection the FCRA provides for identity theft victims is that even in the absence of a security freeze, a CRA may only release a consumer report to a person "which it has reason to believe . . . intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished. . . ." §1681b(a).

62. When a credit transaction is not initiated by the consumer, a CRA may only release the consumer's report with the consumer's authorization or if the user

is making a firm offer of credit. §1681b(c).

63.     No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a permissible purpose. §1681e(a).

64.     To that end, the FCRA imposes the following twin duties on CRAs: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (§1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (§1681i).

65.     Similarly, the FCRA also imposes a duty upon the Furnishers to reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies. §1681s-2(b).

### The CRAs' Method for Considering Consumer Credit Report Disputes

66.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See, § 1681i(a)(5)(D).

67.     The CRAs and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-

created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

68.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."

69.    It is also known industry wide as the CDIA's: "Credit Reporting Resource Guide."

70.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

71.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

72.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

73.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

74.    Upon receiving a dispute from a consumer, the credit bureaus have an

automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

75.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See, §1681s-2(b).

76.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

### *Theft of Plaintiff's Identity*

77.    Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

78.    Plaintiff was born in Puerto Rico and lived there until 2017 when Hurricane Maria devastated the island.

79.    Plaintiff and his mother moved to Florida after the Hurricane.

80.    In or around early 2018, Plaintiff went to a JPMorgan Chase Bank branch in Florida looking to open a checking account.

81.    Plaintiff was perplexed and confused when the banker asked if Plaintiff wanted to open a new account instead of transferring his account from Massachusetts.

82.    Plaintiff has never been to, let alone ever had a bank account in, Massachusetts.

83.    Plaintiff confirmed the banker that the account in Massachusetts was not Plaintiff's or otherwise explained that the account must be the result of the theft of Plaintiff's identity.

84.    Plaintiff left Chase believing the matter would be resolved by Chase and that it was not Plaintiff's problem after all.

85.    Thereafter, in 2018, Plaintiff signed up with Credit Karma and noticed that his credit reports included several accounts that he had no knowledge of.

86.    Plaintiff sought to alert all those creditors who had been defrauded by someone else.

87.    Plaintiff called each and every one of the creditors who were reporting debts on Plaintiff's credit reports.

88.    In his attempts to have the creditors correctly identify Plaintiff and block the thief from continuing to defraud creditors with Plaintiff's personal information, Plaintiff provided the creditors with his actual address and requested that they delete the addresses provided by the thief.

89.     However, the creditors would use Plaintiff's correct address to send him collection attempts, or worse, send his address to the creditors' debt collectors.

90.     Eventually, and after realizing the creditors he had contacted were not pursuing the thief but were instead reporting the debts on Plaintiff's credit reports, Plaintiff filed a police report on or about November 25, 2019.

91.     Upon information and belief, nothing came out of the police report.

92.     Still attempting to correct the issue himself, Plaintiff continued to contact the creditors and the CRAs letting them know that most of the information on Plaintiff's credit reports were fraudulent: personal information including addresses, telephone numbers and even employers were fraudulently provided by the identity thief, but also that _____ of the trade lines were opened by the identity thief.

93.     Upon information, the CRAs forwarded Plaintiff's disputes to the furnishers.

94.     On or about September 14, 2022, Plaintiff filed an IDTheft report with the FTC which identified each and every tradeline associated to debts that Plaintiff did not incur.

<em>Plaintiff Disputes Equifax's Reporting</em>

95.     On or about October 11, 2022, Plaintiff sent a letter to dispute Equifax's inaccurate reporting.

96.    Plaintiff's letter sufficiently identified Plaintiff because the letter included Plaintiff's personal identifiers like his address, date of birth and social security number, and Plaintiff even enclosed a copy of his Florida driver license.

97.    Plaintiff's letter explained that he was the victim of identity theft and attached copies of his reports with the police and the FTC.

98.    Plaintiff's letter identified the following accounts as not having been opened by Plaintiff:

    a.    AMERICAN EXPRESS Account No.: xxxxxxxxxxxx1673

    b.    DISCOVER BANK Account No.: xxxxxxxxxxxx0826

    c.    BLOOMINGDALES/CITIBANK,    N.A.    Account    No.: xxxxxxxxxxxx7206

    d.    MACYS/CITIBANK, N.A. Account No.: xxxxxxxxxxxx2566

    e.    LVNV FUNDING LLC (Original Creditor: CREDIT ONE BANK N.A.) Account No.: xxxxxxxxxxxx4379

    f.    MIDLAND CREDIT MANAGEMENT INC. (Original Creditor: CITIBANK N.A.) Account No.: xxxx8244

    g.    SYNCB/GAP Account No.: xxxxxxxxxxxx3130

    h.    TD BANK USA/TARGET CREDIT Account No.: xxxxxxxxxxxx3459

    i.    CAPITAL ONE Account No.: xxxxxxxxxxxx4606

j.     SYNCB/TOYSRUS Account No.: xxxxxxxxxxxx4344

k.     UPLIFT, INC. Account No.: xxxxxx64

l.     SOURCE RECEIVABLES MANAGEMENT (Original Creditor: SPRINT) Account No.: xxxxxx72

99. Plaintiff's letter further stated that several variations of his name, countless addresses, and even telephone numbers, were not Plaintiff's.

100. Equifax received Plaintiff's letter on or about October 14, 2022.

101. Upon information and belief, Equifax forwarded Plaintiff's dispute letter to the furnishers of the accounts identified as fraudulently opened in Plaintiff's dispute letter.

102. Upon information and belief, Equifax did not send any communications to Plaintiff following Plaintiff's dispute letter, not even to ask Plaintiff any questions to help Equifax in its investigation.

103. On or about January 2, 2023, Plaintiff obtained a copy of his consumer report to verify that Equifax had removed the accounts fraudulently opened and the personal information provided by the identity thief.

104. Upon review of his consumer report, Plaintiff was shocked to find that Equifax had not updated the Plaintiff's report since October 13, 2022, a day prior to receiving Plaintiff's dispute.

105. Thereafter, Plaintiff contacted Equifax and a representative stated

Plaintiff would need to confirm his identity.

106.   On or about January 13, 2023, Plaintiff mailed Equifax a letter to verify his identity and attached copies of the documents requested by the representative.

107.   Equifax received Plaintiff's letter on January 20, 2023.

108.   Equifax replied on a letter dated January 25, 2023 stating that Equifax was "unable to locate a credit file for [Plaintiff] for one of the following reasons:

- You have not applied for credit recently,

- You have not actively used credit in the past ten years, or

- You have not lived in the United States or have not been issued a U.S. Social Security Number."

109.   Upon information and belief, Equifax failed to mark several accounts as disputed by Plaintiff, especially if the account had been closed or was not derogatory.

110.   Upon information and belief, Equifax failed to consider all the information contained in Plaintiff's dispute, particularly the list of addresses and telephone numbers, and the employer that Plaintiff disputed because they were not his. Even more, Plaintiff having always lived in Puerto Rico and never in Massachusetts.

111.   Upon information and belief, Equifax not only failed to block the accounts but also failed to alert the other CRAs and Furnishers that Plaintiff was

claiming the accounts had been the result of the theft of Plaintiff's identity, pursuant to §§1681c-1, 1681c-2.

112.  Upon information and belief, Equifax failed to conduct a reasonable investigation into the matters disputed by Plaintiff, as required under §1681i.

113.  Upon information and belief, Equifax failed to report the results of its investigation to the other CRAs and the relevant furnishers.

114.  Upon information and belief, Equifax conducted no investigation at all, let alone a reasonable investigation. Instead, Equifax seized to update Plaintiff's report.

115.  As a result of Equifax's failure to conduct a reasonable investigation, Equifax continued to report inaccurate information concerning Plaintiff in violation of Equifax's duties under the FCRA.

116.  Equifax does not follow reasonable procedures to assure maximum possible accuracy of the information Equifax reports concerning a particular consumer.

117.  Equifax has not designed and implemented procedures to assure maximum possible accuracy of the information Equifax sells to third parties because Equifax's investigation protocols prioritize cost-saving over accuracy.

118.  Upon information and belief, Equifax is aware that the global savings from conducting minimal investigations, far surpass the damages Equifax may be

eventually required to pay consumers injured by Equifax's violations of its duties under the FCRA.

*Furnishers Fail to Investigate Following Plaintiff's Dispute to Equifax*

119. Upon information and belief, the following furnishers received Plaintiff's letter forwarded to them by Experian:

    a.    Amex

    b.    Capital One

    c.    Citibank

    d.    Discover

    e.    LVNV

    f.    Midland

    g.    SRM

    h.    Synchrony

    i.    TDB

    j.    Uplift

120. Upon information and belief, those furnishers each responded to the dispute forwarded by Equifax, by verifying their reporting as accurate, thus that the accounts fraudulently opened and used by the identity thief belonged to Plaintiff.

121. Those furnishers failed to conduct a reasonable investigation, in violation of §1681s-2(b).

122.    In fact, those furnishers conducted no investigation at all.

123.    Upon information and belief, the computer systems used by those furnishers only confirmed that the information they had been furnishing to Equifax matched the information on each furnisher's database.

124.    Upon information and belief, no representative of any of those furnishers reviewed the results of the "investigation" returned by their computer systems.

125.    Upon information and belief, no representative of any of those furnishers reviewed Plaintiff's dispute forwarded by Equifax, to properly consider the scope of the furnisher's investigation.

126.    Upon information and belief, no furnisher consulted external sources in their investigation of Plaintiff's dispute.

127.    As a result, Amex, Capital One, Citibank, Discover, LVNV, Midland, SRM, Synchrony, TDB, and Uplift's failure to conduct a reasonable investigation pursuant to §1681s-2(b) resulted in Equifax freezing Plaintiff's report and thus report inaccurate information on Plaintiff's credit reports.

128.    Amex, Capital One, Citibank, Discover, LVNV, Midland, SRM, Synchrony, TDB, and Uplift's violation of §1681s-2(b) was not negligent, but a direct and foreseeable consequence of their prioritizing cost-saving over accuracy in complete disregard of Plaintiff's rights under the FCRA.

*Plaintiff Disputes Experian's Reporting*

129.   On or about October 11, 2022, Plaintiff sent a letter to dispute Experian's inaccurate reporting.

130.   Plaintiff's letter sufficiently identified Plaintiff because the letter included Plaintiff's personal identifiers like his address, date of birth and social security number, and Plaintiff even enclosed a copy of his Florida driver license.

131.   Plaintiff's letter explained that he was the victim of identity theft and attached copies of his reports with the police and the FTC.

132.   Plaintiff's letter identified the following accounts as not having been opened by Plaintiff:

      a.     AMERICAN EXPRESS Account No.: 3499924681351673

      b.     CAPITAL ONE Account No.: 548955xxxxxxxxxx

      c.     CITIBANK/BLOOMINGDALES     Account     No.: 603534xxxxxxxxxx

      d.     CBNA/MACYS Account No.: 603534xxxxxxxxxx

      e.     DISCOVER BANK Account No.: 601120xxxxxxxxxx

      f.     MIDLAND CREDIT MANAGEMENT (Original Creditor: CITIBANK N.A.) Account No.: 30179xxxx

      g.     RESURGENT/LVNV FUNDING (Original Creditor: CREDIT ONE BANK N.A.) Account No.: 444796xxxxxxxxxx

h.     SOURCE   RECEIVABLES   MNGMN   (Original   Creditor:

SPRINT) Account No.: 238981xx

i.     SYNCB/GAP Account No.: 601859xxxxxxxxxx

j.     SYNCB/TOYSRUS Account No.: 604586xxxxxxxxxx

k.     TD   BANK   USA/TARGETCREDIT   Account   No.:

585975xxxxxxxxxx

133.  Plaintiff's letter further stated that several variations of his name, countless addresses, and even telephone numbers, were not Plaintiff's.

134.  Experian received Plaintiff's letter on or about October 15, 2022.

135.  Upon information and belief, Experian forwarded Plaintiff's dispute letter to the furnishers of the accounts identified as fraudulently opened in Plaintiff's dispute letter.

136.  Upon   information   and   belief,   Experian   did   not   send   any communications to Plaintiff following Plaintiff's dispute letter, not even to ask Plaintiff any questions to help Experian in its investigation.

137.  On or about December 20, 2022, Plaintiff obtained a copy of his consumer report to verify that Experian had blocked the accounts fraudulently opened, removed the personal information provided by the identity thief, and further mark accounts as disputed by Plaintiff.

138.  Upon review of his consumer report, Plaintiff was shocked to find that

Experian had only removed the Midland Account No. 30179 but was still reporting all the other the fraudulently opened accounts, as well as all the personal information provided by the identity thief.

139. Experian further failed to mark several accounts as disputed by Plaintiff, especially if the account had been closed or was not derogatory.

140. Experian failed to consider all the information contained in Plaintiff's dispute, particularly the list of addresses and telephone numbers, and the employer that Plaintiff disputed because they were not his. Even more, Plaintiff having always lived in Puerto Rico and never in Massachusetts.

141. Experian not only failed to block the accounts but also failed to alert the other CRAs and Furnishers that Plaintiff was claiming the accounts had been the result of the theft of Plaintiff's identity, pursuant to §§1681c-1, 1681c-2.

142. Experian failed to conduct a reasonable investigation into the matters disputed by Plaintiff, as required under §1681i.

143. Experian failed to report the results of its investigation to the other CRAs and the relevant furnishers.

144. Upon information and belief, Experian conducted no investigation at all, let alone a reasonable investigation. Instead, Experian only forwarded Plaintiff's dispute to the relevant furnishers.

145. Assuming Experian received responses from furnishers, Experian's

only "investigation" concluded by Experian parroting the responses from each furnisher.

146. Alternatively, if Experian did not receive responses from one or more furnishers, Experian simply ignored Plaintiff's dispute.

147. As a result of Experian's failure to conduct a reasonable investigation, Experian continued to report inaccurate information concerning Plaintiff in violation of Experian's duties under the FCRA.

148. Experian does not follow reasonable procedures to assure maximum possible accuracy of the information Experian reports concerning a particular consumer.

149. Experian has not designed and implemented procedures to assure maximum possible accuracy of the information Experian sells to third parties because Experian's investigation protocols prioritize cost-saving over accuracy.

150. Upon information and belief, Experian is aware that the global savings from conducting minimal investigations, far surpass the damages Experian may be eventually required to pay consumers injured by Experian's violations of its duties under the FCRA.

*Furnishers Fail to Investigate Following Plaintiff's Dispute to Experian*

151. Upon information and belief, the following furnishers received Plaintiff's letter forwarded to them by Experian:

a.    Amex

b.    Capital One

c.    Citibank

d.    Discover

e.    LVNV

f.    SRM

g.    Synchrony

h.    TDB

152.    Upon information and belief, those furnishers each responded to the dispute forwarded by Experian, by verifying their reporting as accurate, thus that the accounts fraudulently opened and used by the identity thief belonged to Plaintiff.

153.    Those furnishers failed to conduct a reasonable investigation, in violation of §1681s-2(b).

154.    In fact, those furnishers conducted no investigation at all.

155.    Upon information and belief, the computer systems used by those furnishers only confirmed that the information they had been furnishing to Experian matched the information on each furnisher's database.

156.    Upon information and belief, no representative of any of those furnishers reviewed the results of the "investigation" returned by their computer systems.

157.    Upon information and belief, no representative of any of those furnishers reviewed Plaintiff's dispute forwarded by Experian, to properly consider the scope of the furnisher's investigation.

158.    Upon information and belief, no furnisher consulted external sources in their investigation of Plaintiff's dispute.

159.    As a result, Amex, Capital One, Citibank, Discover, LVNV, SRM, Synchrony, and TDB's failure to conduct a reasonable investigation pursuant to §1681s-2(b) resulted in Experian continued reporting of inaccurate information on Plaintiff's credit reports.

160.    Amex, Capital One, Citibank, Discover, LVNV, SRM, Synchrony, and TDB's violation of §1681s-2(b) was not negligent, but a direct and foreseeable consequence of their prioritizing cost-saving over accuracy in complete disregard of Plaintiff's rights under the FCRA.

### *Plaintiff Disputes Trans Union's Reporting*

161.    On or about October 11, 2022, Plaintiff sent a letter to dispute Trans Union's inaccurate reporting.

162.    Plaintiff's letter sufficiently identified Plaintiff because the letter included Plaintiff's personal identifiers like his address, date of birth and social security number, and Plaintiff even enclosed a copy of his Florida driver license.

163.    Plaintiff's letter explained that he was the victim of identity theft and

attached copies of his reports with the police and the FTC.

164. Plaintiff's letter identified the following accounts, *inter alia*, as not having been opened by Plaintiff:

    a.    SYNCB/GAP Account No.: 601859519607****

    b.    CAPITAL ONE Account No.: 548955512858****

165. Plaintiff's letter further stated that several variations of his name, countless addresses, and even telephone numbers, were not Plaintiff's.

166. Trans Union received Plaintiff's letter on or about October 14, 2022.

167. Upon information and belief, Experian forwarded Plaintiff's dispute letter to the furnishers of the accounts identified as fraudulently opened in Plaintiff's dispute letter.

168. On a letter dated November 2, 2022, Trans Union responded to Plaintiff's dispute.

169. Trans Union's letter stated that Trans Union had deleted several accounts disputed by Plaintiff, as well as removed most of the personal information provided by the identity thief.

170. However, Trans Union's letter stated that Trans Union had "verified" that the SYNCB/GAP Account No.: 601859519607****, and the CAPITAL ONE Account No.: 548955512858**** belonged to Plaintiff.

171. Additionally, Trans Union did not remove the name "WILZAYLAL

BRITOSOLIS".

172. Trans Union failed to consider all the information contained in Plaintiff's dispute, particularly the dispute of the joint Capital One account, which was not reporting as derogatory. Trans Union was especially unbothered that Plaintiff had always lived in Puerto Rico and never in Massachusetts, where all the fraudulently opened accounts were located.

173. Trans Union not only failed to block the SYNCB/GAP Account No.: 601859519607****, and the CAPITAL ONE Account No.: 548955512858**** but also failed to alert the other CRAs and Furnishers that Plaintiff was claiming the accounts had been the result of the theft of Plaintiff's identity, pursuant to §§1681c-1, 1681c-2.

174. Trans Union failed to conduct a reasonable investigation into the matters disputed by Plaintiff, as required under §1681i.

175. Trans Union failed to report the results of its investigation to the other CRAs and the relevant furnishers.

176. Upon information and belief, Trans Union conducted no investigation at all, let alone a reasonable investigation. Instead, Trans Union only forwarded Plaintiff's dispute to the relevant furnishers.

177. Assuming Trans Union received responses from furnishers, Trans Union's only "investigation" concluded by Trans Union parroting the responses

from each furnisher.

178.   Alternatively, if Trans Union did not receive responses from one or more furnishers, Trans Union partially ignored Plaintiff's dispute.

179.   As a result of Trans Union's failure to conduct a reasonable investigation, Trans Union continued to report inaccurate information concerning Plaintiff in violation of Trans Union's duties under the FCRA.

180.   Trans Union does not follow reasonable procedures to assure maximum possible accuracy of the information Trans Union reports concerning a particular consumer.

181.   Trans Union has not designed and implemented procedures to assure maximum possible accuracy of the information Trans Union sells to third parties because Trans Union's investigation protocols prioritize cost-saving over accuracy.

182.   Upon information and belief, Trans Union is aware that the global savings from conducting minimal investigations, far surpass the damages Trans Union may be eventually required to pay consumers injured by Trans Union's violations of its duties under the FCRA.

*Furnishers Fail to Investigate Following Plaintiff's Dispute to Trans Union*

183.   Upon information and belief, the following furnishers received Plaintiff's letter forwarded to them by Trans Union:

      a.    Capital One

b.     Synchrony

184.   Upon information and belief, Capital One and Synchrony each responded to the dispute forwarded by Trans Union, by verifying their reporting as accurate, thus that the accounts fraudulently opened and used by the identity thief belonged to Plaintiff.

185.   Capital One and Synchrony failed to conduct a reasonable investigation, in violation of §1681s-2(b).

186.   In fact, Capital One and Synchrony conducted no investigation at all.

187.   Upon information and belief, the computer systems used by Capital One and Synchrony only confirmed that the information they had been furnishing to Trans Union matched the information on each furnisher's database.

188.   Upon information and belief, no representative of any of Capital One and Synchrony reviewed the results of the "investigation" returned by their computer systems.

189.   Upon information and belief, no representative of any of Capital One and Synchrony reviewed Plaintiff's dispute forwarded by Trans Union, to properly consider the scope of the furnisher's investigation.

190.   Upon information and belief, Capital One and Synchrony did not consult external sources in their investigation of Plaintiff's dispute.

191.   As a result, Capital One and Synchrony's failure to conduct a

reasonable investigation pursuant to §1681s-2(b) resulted in Trans Union continued reporting of inaccurate information on Plaintiff's credit reports.

192. Capital One and Synchrony's violation of §1681s-2(b) was not negligent, but a direct and foreseeable consequence of their prioritizing cost-saving over accuracy in complete disregard of Plaintiff's rights under the FCRA.

### *Plaintiff's Damages from FCRA Violations*

193. Plaintiff followed the procedures established by the FCRA for CRAs and Furnishers to stop reporting inaccurate information on Plaintiff's credit report.

194. On several occasions, Plaintiff communicated to the CRAs that Plaintiff was the victim of identity theft.

195. Additionally, Plaintiff filed a police and an FTC reports.

196. Plaintiff sent copies of the police and FTC reports to the CRAs.

197. Plaintiff sufficiently identified himself, clearly stated that he was an identity theft victim and requested that CRAs block the reporting of the fraudulently opened accounts and false addresses, telephone numbers and employer information provided by the identity thief. Plaintiff further requested that an initial fraud alert be placed and disseminated among CRAs and Furnishers.

198. Trans Union removed most —but not all— fraudulently opened accounts and false personal information upon Plaintiff's providing copies of the police and FTC reports.

199. Notably, Equifax and Experian did not remove or block the disputed information.

200. Even more, Equifax repeatedly disregarded Plaintiff's credible disputes responding with form letters requesting the same copies of identification, repeatedly, that Plaintiff had already provided with his dispute letter.

201. CRAs and Furnishers understand it is often the case that an identity thief's activities, often designed intentionally to fabricate information into a credit file, will cause false information to appear on an identity theft victim's credit file.

202. Despite Plaintiff's telephone and letter disputes, repeatedly stating that Plaintiff was a victim of identity theft, CRAs hardly waivered in their refusal to remove those accounts and information, or inexplicable removing some but not all.

203. As a direct result of the CRAs and Furnishers ardent refusal to block, place fraud alerts and remove the disputed inaccurate information, CRA's and Furnishers have continued to harm Plaintiff with the accounts and personal information which were the product of the theft of Plaintiff's identity.

204. Due to CRAs and Furnishers' ardent refusal to comply with their respective obligations under the FCRA, Plaintiff was forced to obtain legal advice and counsel, for which he has incurred attorneys' fees and other expenses.

205. Further, to CRAs and Furnishers' ardent refusal to comply with their respective obligations under the FCRA, Plaintiff expended countless hours disputing

the inaccurate reporting with CRAs, repeatedly, to no or little avail.

206.    CRAs and Furnishers' conduct disrupted Plaintiff's life to the degree where Plaintiff had to pause or delay his dispute efforts just to manage his other personal affairs.

207.    As Plaintiff is employed, his non-working time is limited and particularly valuable to him. It has taken Plaintiff an incredible amount of time to document events, secure his credit, and track down supporting documents, all of which affected his ability to spend time on his personal obligations and enjoyment of his free time.

208.    In addition to impacting his work productivity and income, dealing with the consequences of CRAs and Furnishers' unlawful conduct has taken Plaintiff away from time he would otherwise have spent with his friends and family. It has taken a toll on Plaintiff's relationships and enjoyment of life.

209.    CRAs and Furnishers unlawful conduct has caused Plaintiff extreme and ongoing stress and anxiety. Plaintiff has suffered sleepless nights, frustration, worry, and ultimately felt utterly hopeless that CRAs and Furnishers would never properly reinvestigate his disputes, prolonging the damage suffered from the theft of Plaintiff's identity.

210.    Further, Plaintiff reasonably believes that the fraudulent inquiries have negatively impacted and depressed his credit score. Plaintiff was eventually able to

obtain a credit card from Capital One, at much worse terms than if CRAs and Furnishers had not been reporting the countless fraudulent accounts as belonging to Plaintiff.

211. At all times pertinent hereto, CRAs and Furnishers were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the CRAs and Furnishers.

212. At all times pertinent hereto, the unlawful conduct of CRAs and Furnishers, as well as that of their representative agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

213. CRAs have a long history of disregarding the credit reporting rights of identity theft victims under the FCRA.

214. CRAs have had years of notice in the form of federal lawsuits, despite it all, CRAs did not take any better steps to respect Plaintiff's FCRA rights here.

215. The internal policies and procedures of CRAs do not appear to place any value on their obligations under the FCRA to, *inter alia*, block information, place initial fraud alerts, report credit entries accurately, reasonably reinvestigate when notified of a consumer dispute. Nor do CRAs' policies and procedures reflect their statutory duties to enforce or at minimum add fraud alerts as requested by the

consumer under the FCRA.

216. As a standard practice, CRAs do not conduct independent investigations in response to consumer disputes. Instead, CRAs merely parrot the response of Furnishers, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by §1681(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed).

217. CRAs are aware of the shortcomings of their respective procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the CRAs' violations of the FCRA are not negligent but intentionally downplayed or disregarded, and therefore their violations are willful.

218. CRAs' policies and procedures clearly establish willfulness, wantonness, and utter and reckless disregard for the rights and interests of consumers and led directly to the injuries of Plaintiff as described in this complaint.

219.   As a result of CRAs and Furnishers' unlawful conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the personal information which were the product of identity theft.

220.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is repeatedly doubted and questioned and disbelieved by the CRAs and Furnishers.

221.   Plaintiff applied for and received a credit card from Capital One. Plaintiff was approved at much worse terms had his credit reporting not contained inaccurate information.

*Debt Collectors' Violations of FDCPA and FCCPA*

222.   Debt Collectors are attempting to collect debts from Plaintiff.

223.   Upon information and belief, Debt Collectors had actual and/or imputed notice that Plaintiff disputed the debts Debt Collectors were attempting to

collect, when Debt Collectors and/or the original creditors received copies of Plaintiff's dispute letters to CRAs, or when Plaintiff disputed the accounts by telephone directly with each separate creditor.

224. Credit Control has been attempting to collect a debt from Plaintiff that the identity thief opened with Citibank (account No. 2566), and which Plaintiff had disputed as not belonging to Plaintiff.

225. On July 31, 2022, Credit Control sent a collection attempt to collect on a debt originally owed to Citibank resulting from an account opened by the identity thief and previously disputed by Plaintiff as not belonging to him.

226. Credit Control was required to not send any communications including collection attempts, as Credit Control had notice that Plaintiff had stated in writing that he was refusing to pay the debt because the debt did not belong to him.

227. Credit Control's collection attempt is false, deceptive and misleading because Credit Control falsely represented the character, amount, or legal status of the debt that had been disputed by Plaintiff as not belonging to him.

228. Credit Control's collection attempt further contained false representations and was a deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff.

229. Credit Control's collection attempt further claimed, attempted, and threaten to enforce a debt when Credit Control knew that the debt is not legitimate

because Plaintiff had disputed the debt as not belonging to him.

230. Midland has been attempting to collect debts from Plaintiff that the identity thief opened with Capital One (account No. 9186), Citibank (account No. 2386) and Synchrony (account No. 3130), and which Plaintiff had disputed as not belonging to Plaintiff.

231. On or about August 24, 2022, Midland sent a collection attempt to collect on a debt originally owed to Citibank resulting from an account opened by the identity thief and previously disputed by Plaintiff as not belonging to him.

232. On or about August 24, 2022, Midland sent a collection attempt to collect on a debt originally owed to Capital One resulting from an account opened by the identity thief and previously disputed by Plaintiff as not belonging to him.

233. On or about December 1, 2022, Synchrony sent Plaintiff a letter stating that Synchrony had sold to Midland the debt resulting from account No. 3130 opened by the identity thief and previously disputed by Plaintiff as not belonging to him

234. Upon information and belief, Midland has sent a similar collection attempt to collect on a debt originally owed to Synchrony resulting from an account opened by the identity thief and previously disputed by Plaintiff as not belonging to him.

235. Midland was required to not send any communications including collection attempts, as Midland had notice that Plaintiff had stated in writing that he

was refusing to pay the debts because the debts did not belong to him.

236.    Midland's collection attempts are false, deceptive and misleading because Midland falsely represented the character, amount, or legal status of the debts that had been disputed by Plaintiff as not belonging to him.

237.    Midland's collection attempts further contained false representations and were a deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff.

238.    Midland further communicated to Equifax credit information which Midland knew or which should have known to be false, and further failed to communicate that the debt had been disputed by Plaintiff as not belonging to him.

239.    Midland's collection attempts further claimed, attempted, and threaten to enforce a debt when Midland knew that the debts are not legitimate because Plaintiff had disputed the debts as not belonging to him.

240.    Radius has been attempting to collect a debt from Plaintiff that the identity thief opened with Citibank (account No. 2386) —the same debt as Credit Control—, and which Plaintiff had disputed as not belonging to Plaintiff.

241.    On November 12, 2022, Radius sent a collection attempt to collect on a debt originally owed to Citibank resulting from an account opened by the identity thief and previously disputed by Plaintiff as not belonging to him.

242.    Radius was required to not send any communications including

collection attempts, as Radius had notice that Plaintiff had stated in writing that he was refusing to pay the debt because the debt did not belong to him.

243.   Radius's collection attempt is false, deceptive and misleading because Radius falsely represented the character, amount, or legal status of the debt that had been disputed by Plaintiff as not belonging to him.

244.   Radius's collection attempt further contained false representations and was a deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff.

245.   Radius's collection attempt further claimed, attempted, and threaten to enforce a debt when Radius knew that the debt is not legitimate because Plaintiff had disputed the debt as not belonging to him.

246.   Further, Credit Control and Radius were simultaneously attempting to collect on the Citibank account No. 2386, thereby their collection attempts were further false, deceptive and misleading as to the character, amount, or legal status of the debt that had been disputed by Plaintiff as not belonging to him. Both Credit One and Radius knew that the debt was not legitimate.

247.   SRM has been attempting to collect a debt from Plaintiff that the identity thief opened with non-party Sprint (account No. 2389), and which Plaintiff had disputed as not belonging to Plaintiff.

248.   SRM further communicated to Trans Union credit information which

SRM knew or which should have known to be false, and further failed to communicate that the debt had been disputed by Plaintiff as not belonging to him.

249. Upon information and belief, SRM was further attempting to collect debts from Plaintiff.

250. Debt Collectors are well aware of the FDCPA and FCCPA.

251. Debt Collectors' violations of the FDCPA and FCCPA did not result from a bona fide error, notwithstanding the maintenance of procedures reasonably adapted to avoid such error.

252. As a result of Debt Collector's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from the Debt Collectors, concerning debts that Plaintiff had abundantly disputed, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of being a victim of identity theft.

253. Each and every attempt to collect from Debt Collectors caused Plaintiff shock and confusion.

254. Each and every attempt to collect from Debt Collectors caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being a victim of identity theft for the rest of his life without ever seeing justice done.

255. Upon each and every attempt to collect from Debt Collectors, Plaintiff

had to expend time, effort and money into attempting to discover the origin of the debt being collected, whether he had previously disputed the debt, whether the debt was reporting as a separate trade line on his credit reports, and making copies or storing the collection attempts in a safe place.

## COUNT I

### Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681e(b)

### CRAs' Failure to Follow Reasonable Procedures to

### Assure Maximum Possible Accuracy

256. Plaintiff incorporates by reference paragraphs 49 to 221 of this Complaint as though fully set forth herein at length.

257. The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. §1681e(b).

258. On numerous occasions, CRAs prepared patently false consumer reports concerning Plaintiff.

259. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, CRAs readily and repeatedly sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness by suggesting that Plaintiff was applying for multiple lines of

credit.

260. Further, because almost all of those fraudulent credit accounts had derogatory statuses, a third party reviewing those reports would reasonably infer that Plaintiff was a serial defaulter.

261. CRAs violated §1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files CRAs published and maintained concerning Plaintiff.

262. As a result of CRAs' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

263. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by the CRAs.

264. CRAs' conduct, actions, and inactions were willful, rendering CRAs'

liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover damages under §1681o.

265.  Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT II

### Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681i

### CRAs' Failure to Conduct a Reasonable Investigation

266.  Plaintiff incorporates by reference paragraphs 49 to 221 of this Complaint as though fully set forth herein at length.

267.  The FCRA mandates that a CRA conduct an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. §1681i(a)(1).

268.  The FCRA imposes a 30-day limitation for the completion of such an investigation. *Id*.

269.  The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. §1681i(a)(5)(A).

270. Throughout the five years preceding the filing of this Complaint, Plaintiff disputed the reporting of inaccurate information by CRAs and requested that CRAs correct and/or delete a specific item in his credit file that is patently inaccurate, misleading, and highly damaging to him, namely, the fraudulent inquiries that were the product of identity theft.

271. Plaintiff supported his disputes with copies of his Florida driver license, and of the police FTC reports.

272. Despite actual and implied knowledge that Plaintiff was the victim of identity theft, and in response to Plaintiff's disputes, CRAs conducted virtually no investigations of Plaintiff's disputes —let alone a reasonable investigation—, or such investigations were so shoddy as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

273. Plaintiff expended resources in the form of time and money to repeatedly dispute the patently inaccurate reporting with CRAs.

274. Equifax and Experian's "reinvestigations," were rendered that much more deficient considering Trans Union deleted almost all the account and personal information resulting from the theft of Plaintiff's identity.

275. Equifax's failure to respond to Plaintiff's dispute, failure to update his report and failure to provide Plaintiff with a consumer report pretextually requesting the same information Plaintiff had attached to his dispute letter, prolonged the harm

suffered by Plaintiff from the theft of his identity.

276.   CRAs violated §1681i by failing to conduct a reasonable investigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

277.   As a result of CRAs' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

278.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by CRAs.

279.   CRAs' conduct, actions, and inactions were willful, rendering CRAs

liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover under §1681o.

280. Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT III

### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681c-1

### CRAs' Failure to Place a Fraud Alert

281. Plaintiff incorporates by reference paragraphs 49 to 221 of this Complaint as though fully set forth herein at length.

282. CRAs violated §1681c-1 by failing to include a fraud alert in Plaintiff's consumer file on the date Plaintiff initially disputed CRAs reporting, and CRAs failed to circulate information regarding the fraud alert to the other consumer reporting agencies and Furnishers. Further, CRAs violated §1681c-1 by failing to include a fraud alert in Plaintiff's consumer file on the date of Plaintiff's initial request for a period of not less than 7-years.

283. Plaintiff requested that CRAs add a fraud alert to his file to prevent any future occurrence of identity theft.

284. Specifically, Plaintiff requested that CRAs add a fraud alert that would be ongoing, rather than the ineffective one-year alert.

285.    Despite Plaintiff's repeated requests, CRAs failed to add a fraud alert to Plaintiff's file, even though Plaintiff requested that action since at least 2018.

286.    As a result of CRAs' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

287.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by CRAs.

288.    CRAs' conduct, actions, and inactions were willful, rendering CRAs liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover under §1681o.

289.    Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT IV

### Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681c-2

### CRAs' Failure to Block Identity Theft Information

290. Plaintiff incorporates by reference paragraphs 49 to 221 of this Complaint as though fully set forth herein at length.

291. CRAs violated §1681c-2 by failing to block the reporting of the disputed information which was due to identity theft, from Plaintiff's file.

292. Plaintiff submitted ample evidence of the fact that Plaintiff was the victim of identity theft. Plaintiff supported the fact that Plaintiff was a victim of identity theft by providing CRAs copies of a police and FTC reports. Plaintiff further explained that he had lived in Puerto Rico until at least 2017, and all fraudulently opened accounts and personal information were located in Massachusetts.

293. CRAs should have blocked all identity theft accounts and personal information, but failed to do so at every turn or only partially did so.

294. As a result of CRAs' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

295.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by CRAs.

296.   CRAs' conduct, actions, and inactions were willful, rendering CRAs liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1681n. In the alternative, CRAs were negligent, entitling Plaintiff to recover under §1681o.

297.   Plaintiff is entitled to recover attorneys' fees and costs from CRAs in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT V

**Violation of the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(b)**

**Furnishers' Failure to Conduct an Investigation of the Disputed Information**

**and Review of all Relevant Information Provided by the Consumer**

298.   Plaintiff incorporates by reference paragraphs 49 to 221 of this Complaint as though fully set forth herein at length.

299.   Furnishers violated §1681s-2(b) by failing to investigate Plaintiff's dispute(s), or otherwise by failing to fully and properly investigate Plaintiff's

dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct Furnishers' own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to CRAs; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to CRAs.

300.    As a result of Furnishers' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; reduced overall creditworthiness; the expenditure of time and money disputing and trying to remove the inquiries which were the product of identity theft; and, the expenditure of labor and effort disputing and trying to remove the inquiries which were the product of identity theft.

301.    Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Furnishers.

302.    Furnishers' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to

be determined by the Court pursuant to §1681n. In the alternative, Furnishers were negligent, entitling Plaintiff to recover under §1681o.

303.   Plaintiff is entitled to recover attorneys' fees and costs from Furnishers in an amount to be determined by the Court pursuant to §§1681n, 1681o.

## COUNT VI

**Violation of the Fair Debt Collection Practices Act, 15 U.S.C. §1692**

**Debt Collectors' False, Deceptive and Misleading Communications**

304.   Plaintiff incorporates by reference paragraphs 222 to 255 of this Complaint as though fully set forth herein at length.

305.   Debt Collectors violated the FDCPA by continuing to send collection attempts to Plaintiff after Debt Collectors had knowledge that Plaintiff refused to pay the debts as those debts resulted from the theft of Plaintiff's identity, in violation of §1692c(c).

306.   Debt Collectors violated the FDCPA by using false, deceptive and misleading communications when attempting to collect debts from Plaintiff when Debt Collectors had knowledge that those debts resulted from the theft of Plaintiff's identity, in violation of §1692e. Specifically:

a.      Debt Collectors falsely represented the character, amount, or legal status of the debts that had been disputed by Plaintiff as not belonging to him, in violation of §1692e(2)

b.      Debt Collectors' collection attempts further contained false representations and were a deceptive means to attempt to collect a debt or to obtain information concerning Plaintiff, in violation of §1692e(10).

c.      Midland and SRM further communicated to Equifax and Trans Union, respectively, credit information which Midland and SRM knew or which should have known to be false, and further failed to communicate that the debt had been disputed by Plaintiff as not belonging to him, in violation of §1692e(8).

307.    As a result of Debt Collector's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from the Debt Collectors, concerning debts that Plaintiff had abundantly disputed, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of being a victim of identity theft.

308.    Each and every attempt to collect from Debt Collectors caused Plaintiff shock and confusion.

309.    Each and every attempt to collect from Debt Collectors caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being a victim of identity theft for the rest of his life without ever seeing justice done.

310.    Upon each and every attempt to collect from Debt Collectors, Plaintiff

had to expend time, effort and money into attempting to discover the origin of the debt being collected, whether he had previously disputed the debt, whether the debt was reporting as a separate trade line on his credit reports, and making copies or storing the collection attempts in a safe place.

311. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Debt Collectors.

312. Debt Collectors' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to §1692k(a).

313. Plaintiff is entitled to recover attorneys' fees and costs from Debt Collectors in an amount to be determined by the Court pursuant to §1692k(a)(3).

## COUNT VII

**Violation of the Florida Consumer Collection Practices Act, §559.55, Fla. Stat.**

**Debt Collectors' False, Deceptive and Misleading Communications**

314. Plaintiff incorporates by reference paragraphs 222 to 255 of this Complaint as though fully set forth herein at length.

315. Debt Collectors violated the FCCPA by claiming, attempting, and threatening to enforce debts when Debt Collectors knew that the debts are not legitimate, or asserted the existence of some other legal right, because Debt Collectors were on actual or imputed notice that Plaintiff disputed those debts as having resulted from the theft of Plaintiff's identity, in violation of §559.72(9).

316. As a result of Debt Collector's unlawful conduct, Plaintiff has been harmed. Each and every attempt to collect from the Debt Collectors, concerning debts that Plaintiff had abundantly disputed, forced Plaintiff to relive and compound the pain, stress, and suffering from the consequences of being a victim of identity theft.

317. Each and every attempt to collect from Debt Collectors caused Plaintiff shock and confusion.

318. Each and every attempt to collect from Debt Collectors caused Plaintiff to come to the devastating realization that no matter what Plaintiff did, Plaintiff will continue to suffer the consequences of being a victim of identity theft for the rest of his life without ever seeing justice done.

319. Upon each and every attempt to collect from Debt Collectors, Plaintiff had to expend time, effort and money into attempting to discover the origin of the debt being collected, whether he had previously disputed the debt, whether the debt was reporting as a separate trade line on his credit reports, and making copies or

storing the collection attempts in a safe place.

320.   Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish and pain, sleep loss, reputational damage, humiliation, stress, anger, frustration, shock, violation of Plaintiff's right to privacy, fear, worry, anxiety, and embarrassment attendant to being a victim of identity theft whose veracity is doubted and questioned and disbelieved by Debt Collectors.

321.   Debt Collectors' conduct, actions, and inactions were willful, rendering them liable for actual, statutory, and punitive damages in an amount to be determined by the Court pursuant to §559.77(2).

322.   Plaintiff is entitled to recover attorneys' fees and costs from Debt Collectors in an amount to be determined by the Court pursuant to §559.77(2).

## V.    PRAYER FOR RELIEF.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant the following relief against Defendants:

a.   Declaratory judgment that Furnishers and CRAs violated the FCRA, 15 U.S.C. §1681;

b.   An award of actual, statutory, and punitive damages pursuant to 15 U.S.C. §1681;

c.   An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C.

§§1681n, 1681o;

d. Declaratory judgment that Debt Collectors violated the FDCPA, 15 U.S.C. §1692, and the FCCPA, §559.55, Fla. Stat.;

e. An award of actual and statutory damages pursuant to 15 U.S.C. §1692k(a);

f. An award of actual, statutory and punitive damages pursuant to §559.77(2), Fla. Stat.;

g. An award of costs and reasonable attorneys' fees pursuant to 15 U.S.C. §1692k(a)(3), and §559.77(2), Fla. Stat.;

h. Such other and further relief as this Honorable Court may deem just and proper, including any applicable pre-judgment and post-judgment interest, and/or declaratory relief.

## VI.   JURY DEMAND.

Plaintiff hereby demands jury trial on all issues so triable.

Date: April 24, 2023

**CONSUMER ATTORNEYS**

/*s/ Santiago J Teran*
Santiago J Teran (FL Bar No. 1018985)
E-mail: steran@consumerattorneys.com
Consumer Attorneys
2125 Biscayne Bldv., Ste 206
Miami, FL 33137
Direct: (347) 946-7990
Facsimile: (718) 715-1750

Consumer Attorneys
8245 N. 85th Way
Scottsdale, AZ 85258

*Attorney for Plaintiff*
*Wilzaylan Brito Solis*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

By: */s/ Susan Allsopp*